483 F.2d 933
 John BRAXTON, Appellant in No. 72-1491, et al.
v.
Norman CARLSON, Individually and as Director, Federal Bureau
of Prisons, Noah Alldredge, individually and as Warden,
Lewisburg, Federal Penitentiary, together with their
employees, agents, attorneys and all others acting in
concert with them.
 No. 72-1491.
 United States Court of Appeals,
Third Circuit.
 Argued April 5, 1973.
Decided Aug. 27, 1973.
 
 David Rudovsky, Kairys & Rudovsky, Philadelphia, Pa., Stanley A. Bass, NAACP Legal Defense Fund, New York City, for appellants.
 S. John Cottone, Harry A. Nagle, Scranton, Pa., J. Michael Quinlan, Bureau of Prisons, Dept. of Justice, George S. Kopp, Appellate Section, Crim. Div., Dept. of Justice, Washington, D. C., for appellees.
 Before McLAUGHLIN, ROSENN and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 This appeal by six prisoners in a federal penitentiary presents to this court for the first time the question of the extent of the procedural hearing rights to which prisoners are constitutionally entitled when they are disciplined. Although we have held prisoners are entitled in certain circumstances to a hearing before being disciplined,[1] we have not previously been called upon to determine the extent of due process which must be accorded in that hearing. In the case sub judice, Judge Muir of the United States District Court for the Middle District of Pennsylvania held that the prisoners had been accorded all rights constitutionally required. We agree and affirm.
 
 
 2
 * Plaintiff-appellants were incarcerated in the Allenwood Prison Camp, a minimal security installation near the Federal Penitentiary at Lewisburg, Pennsylvania, in July 1971.[2] Plaintiff below, George Mische, confronted Correctional Officer Theodore Sulouff on July 26, 1971, complaining that the Officer had inspected the contents of Mische's personal locker in his absence. Mische suspected Sulouff of conspiring against him with a prison informer, because of Mische's political beliefs, in an attempt to frame him for possession of contraband. Sulouff wrote a Report of Misconduct on Mische, charging him with insolence toward a prison officer.
 
 
 3
 Following filing of the report and an investigation of the incident, the Camp Adjustment Committee[3] decided to invoke a prior suspended sentence of punitive segregation against Mische. On the afternoon of July 29, he was prepared for transportation to the Lewisburg Federal Penitentiary where he was to serve the segregation sentence. His removal had to be postponed until the next day when a crowd of unruly prisoners gathered and blocked the truck which was to transport him, an incident characterized by the district court as a near-mutiny.
 
 
 4
 On July 30, nineteen Allenwood inmates were transported to Lewisburg because they had been identified as participants in the incident. Each was placed in segregated status, pending disciplinary hearings. On August 1 each transferee was read the charges of misconduct against him. Written charges were not presented, but paper and pencil were made available.
 
 
 5
 The Lewisburg Adjustment Committee met to consider the charges on August 2. On the committee were Lewisburg Associate Warden William Rauch, and the prison's chief classification and parole officer, the chief medical officer, and the chief correctional supervisor. A standard procedure was employed in each inmate's case. The charge was read to him. The accused was then given an opportunity to speak in his own behalf. The prison official who made the charge may or may not have been present, but he was not asked to testify or subject himself to cross-examination. The accused was not given any Miranda warnings nor assistance of counsel; neither was he allowed to call witnesses, nor was he informed of his right to appeal to the prison warden.
 
 
 6
 The Adjustment Committee hearings resulted in assessment of the following penalties against appellants: Prince K. Monyea was sentenced to an unspecified term in segregation, which in fact lasted two months, and resulted in almost a nine month postponement of his tentative release date. Ken Staple spent a week in segregation before being transferred to another federal prison, thus postponing his release date approximately 75 days. John Braxton, Carl Craig and Kevin McLean spent two months, five days and about thirty-five days, respectively, in segregation; and John Hilker was sent to Lewisburg Farm. All plaintiffs had misconduct reports placed in their files. These reports are considered by the United States Parole Board.
 
 
 7
 The variances among penalties reflected not only varying conduct for which the prisoners were punished, but also the Committee's review of each accused's prison record and consideration of comments on his general behavior from prison officials.[4]
 
 
 8
 The district court denied the prisoners' claims for injunctive and declaratory relief after holding a factual hearing at which the inmates and prison officials testified. The court assumed arguendo that the prisoners had suffered "grievous losses" as a result of their punishments and thus were entitled to due process hearings on the basis of Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969). It held, however, that all due process guarantees required in the prison disciplinary system had been granted as appellants had: (a) received adequate notice of the charges, (b) been informed of the substance of the evidence against them, (c) been given an opportunity to respond to the charges, and (d) been adjudged by an impartial tribunal which made a reasonable investigation into the charges.
 
 
 9
 The district court found the prisoners had failed to sustain the burden of proof to demonstrate that (a) they had been adjudged by a partial tribunal, (b) their adjudications had been based on irrelevant evidence, or (c) they were unaware of their right to appeal to the prison warden.4A The court rejected the prisoners' claims to be entitled to (a) written notice of the charges, (b) representation by counsel or a lay substitute, (c) confrontation by and cross-examination of their accusers, (d) presentation of witnesses on their own behalf, and (e) written notice of the disciplinary committee's determination.
 
 
 10
 On this appeal, the prisoners dispute the district court's finding of an impartial tribunal which considered only relevant evidence and its conclusion that they were not constitutionally entitled to written notice, representation by counsel, confrontation and cross-examination of adverse witnesses, presentation of favorable witnesses, an accurate written record of the proceedings, and a written report of the committee's findings and conclusions. Appellants also seek reversal of the district court determination that immunity against future use of his testimony by a prisoner need not be given in prison disciplinary hearings.
 
 II
 
 11
 The threshold question in this appeal is whether appellants had a constitutional right to hearings before they were disciplined. In Gray v. Creamer, 465 F.2d 179, 185 (3d Cir. 1972), we stated:
 
 
 12
 [W]e do hold that the transfer of a prisoner from the general prison population to solitary confinement without either notice of the charges or a hearing does not, absent unusual circumstances . . ., meet minimal due process requirements.
 
 
 13
 In dicta explicating the Gray holding, we said further in United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197, 1203 (3d Cir. 1973), that a transfer to punitive segregation must "be based, after hearing, on 'facts rationally determined."' Although we dealt solely with claims of state prisoners in Gray and Tyrrell, we see no reason why the principles we stated therein would not be applicable to federal prisoners.
 
 
 14
 In the present case, appellants Monyea, Braxton, Staple, McLean and Craig were disciplined with terms of segregated confinement varying from five days to two months. Two questions are involved in determination of whether a due process hearing was required before the assessment of these penalties: (1) Is Gray v. Creamer to be applied retroactively? and (2) Were the periods of segregated confinement so short as to constitute the "unusual circumstances" in which Gray would not require a due process hearing?
 
 
 15
 Gray v. Creamer was filed August 14, 1972, more than one year after the hearings in dispute in the present case. This court has not yet had to determine whether its holding in Gray is to be applied retroactively. United States ex rel. Arzonica v. Scheipe, 474 F.2d 720, 722 (3d Cir. 1973).[5] That question, however, is squarely presented in the case sub judice: appellants' contentions hinge on a preliminary determination that they had a constitutional right to a hearing. Nonetheless, in light of our subsequent conclusion, see pp. 938-942 infra, that adequate due process was accorded these prisoners in the hearings which they were afforded, we need not reach the issue of retroactivity to dispose of the present appeal, particularly since it was not argued or briefed and any such determination would have major effects not only on federal prisons but also on state prisons within the circuit.
 
 
 16
 We do, however, reach the issue of whether the shortness of the periods of segregated confinement constituted an "unusual circumstance," which precluded the necessity of holding a hearing. We find that even in the cases of appellants McLean and Craig, each confined in punitive segregation for five days, a due process hearing would be constitutionally required.
 
 
 17
 In United States ex rel. Arzonica v. Scheipe, 474 F.2d 720, 722 (3d Cir. 1973), we stated:
 
 
 18
 We therefore deem it appropriate to state that Gray may not be interpreted as announcing a per se rule that any transfer of a prisoner to solitary confinement without notice of charges or a hearing constitutes a constitutional deprivation. The rule of reason still prevails; the exigencies of acute and critical situations in prison may require swift and decisive administrative action without the fear of exposing prison officials to the threat of subsequent liability for money damages arising out of decisions made in the good faith exercise of administrative descretion. Moreover, the holding in Tyrrell was predicated upon an allegation of nine months' segregation. Clearly, this was an example of "substantial punishment," described in Gray as necessitating establishment of constitutional safeguards.
 
 
 19
 In Gray itself, we recognized certain "unusual circumstances."
 
 
 20
 This is not to say, of course that this notice or hearing must in all cases precede the transfer to solitary confinement; in some cases, as, for example, during a prison riot, notice and hearing must be delayed a reasonable period of time.
 
 
 21
 465 F.2d at 186 n. 6.
 
 
 22
 The language we used in both Gray and Arzonica makes it clear that no hearing was required in the present case before the prisoners were transferred from Allenwood to Lewisburg, where they were placed in segregation pending hearings. After the near-mutiny at Allenwood, such necessary measures for maintenance of prison security and discipline were fully warranted. Segregated confinement for three days awaiting the hearings was not unreasonable under the circumstances.
 
 
 23
 Further incarceration under segregated conditions, however, could not have been justified on the present record without hearings. Nothing in the record indicates that as of August 2, the day of the hearings, unusual circumstances existed which would have necessitated emergency measures. The segregated sentences imposed after August 2 would have been proper only if preceded by a due process hearing.
 
 
 24
 It is of course true that hearings were held in the present case. Because we have not met the issue of whether Gray should be applied retroactively, we cannot say that those hearings were constitutionally required in 1971. We have, nonetheless, discussed the issue for future guidance to district courts and prison officials on the scope of the Gray "unusual circumstances" exception.[6]
 
 
 25
 The sixth appellant, Hilker, was not placed in segregation. He was merely transferred to Lewisburg Farm, another minimum security institution like Allenwood. Hilker, therefore, neither was transferred out of the general prison population nor suffered any loss of "camp good times days" as a result of the discipline proceedings.
 
 
 26
 Appellants argue that a due process hearing is required not only before prisoners are placed in segregated confinement, but also before they are transferred to any prison where they lose the right to earn extra "good time" days. Under 18 U.S.C. Sec. 4161, all federal prisoners can receive deductions from their term of sentence for good conduct; under 18 U.S.C. Sec. 4162, prisoners may receive further good time day deductions from their sentence for employment in a prison industry or camp. All prisoners at Allenwood received such bonus good time days. Disciplinary transfer, even if not accompanied by confinement in segregated conditions, can result in a loss of the ability to earn such bonus days.
 
 
 27
 We need not decide in the present appeal, however, whether discipline resulting in the loss of the ability to earn bonus good conduct days must be preceded by a due process hearing. Five of the appellants were disciplined by segregation penalties; the sixth appellant, by being transferred from a federal prison camp to a federal prison farm, did not lose his right to earn bonus good time days. No appellant therefore claims due process rights solely on the basis of loss of the ability to earn such bonus good time days.[7]
 
 
 28
 Appellants also argue that due process hearings are required before bad conduct reports are placed in a prisoner's file. This claim is relevant to appellant Hilker, as well as the other five prisoners, as he received such a bad conduct report following his hearing. At least one court has held due process hearings are required before filing of such reports. Clutchette v. Procunier, 328 F. Supp. 767, 776-777 (N.D.Cal.1971). In light of our conclusion, infra at pp. 938-942, that the hearings which all appellants received were adequate under due process standards, and the absence in the record of extended information about the effect of such bad conduct reports, we do not reach the issue of whether due process hearings are always required before filing of bad conduct reports.[8]III
 
 
 29
 On the assumption that a constitutional right to a due process hearing existed before the appellants could have been disciplined by segregated confinement punishments, the primary question presented to us on this appeal is the extent of the procedures required in a correctional institution setting to provide adequate due process.
 
 
 30
 Determination of the procedural requirements of due process in federal prison Adjustment Committee hearings must begin with an examination of the nature of the proceeding. As Chief Justice Burger stated in discussing parole revocation hearings:
 
 
 31
 It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands. "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the governmental function involved as well as of the private interest that has been affected by governmental action."
 
 
 32
 Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).
 
 
 33
 Adjustment Committee hearings, as employed at the Allenwood and Lewisburg federal institutions consistent with national policies of the Bureau of Prisons, are low-level disciplinary proceedings. Prisoners apprehended for minor infractions of prison regulations are merely counseled; no written reports are made. Prisoners apprehended for more severe but intermediate offenses, such as insolence or insubordination to correction officials or stealing eggs from the kitchen, are often reported to the Adjustment Committee in writing by a prison official. Serious offenses, which warrant severe penalties and indicate rehabilitative progress has retrogressed, lead to proceedings before the Good Time Forfeiture Board. Offenses which are sufficiently serious as to merit criminal prosecution are referred to the Department of Justice.
 
 
 34
 The Adjustment Committee is not merely a guilt adjudicating disciplinary body. It is also part of the rehabilitation and correctional system for determining the institutional program and service to which the prisoner should be referred. The Committee therefore considers not only the alleged infraction, but also past reports of the prisoner's behavior, his sentence, and his attitudes.
 
 
 35
 Prison officials consider proceedings before the Good Time Forfeiture Board to be considerably more serious than those before Adjustment Committees. Penalties assessed in either proceeding can similarly affect the length of confinement. The Board can revoke already accrued good time days; the Committee can deprive the prisoner of the chance to earn bonus good time days in the future. The likelihood of parole, however, seems to be much more seriously affected by Board proceedings. Good Time Forfeiture Board proceedings, therefore, appropriately include more procedural safeguards than do Adjustment Committee proceedings. See note 6 infra.
 
 
 36
 Adjustment Committee proceedings lack a number of the due process practices familiar in judicial proceedings. The normal procedure, followed in the hearings of the six appellants, begins with the filing of a bad conduct report by a correctional official. An "investigator" is assigned to the case. His investigation may include interviewing the officer who filed the report and other observers of the alleged conduct, but it also may, as in the case of the six appellants, involve little more than a reading of the misconduct charges to the prisoner and an inquiry of him as to his comments.
 
 
 37
 The prisoner is then brought before the Adjustment Committee itself. Present besides the Committee, consisting in the instant case of four chief administrative prison officials, may be other prison officials. The reporting correctional officer himself is often not present; his original report alone (with any added comments written in by the investigator) often constitutes the entire case against the prisoner. The prisoner is asked if he has any comments on the report. The prisoner may also be asked about other reports in his prison file dealing with his behavior. The prisoner then leaves the committee room while it determines the proper disciplinary action, if any, which should be taken-placement in segregated confinement, transfer to another prison, or merely filing of a bad conduct report.
 
 
 38
 Lewisburg prison officials candidly admitted at the hearing in the district court that they normally believe the charges in the original misconduct report filed by a correctional officer, even when the accused prisoner denies them. They stated that one of the reasons for allowing the accused to give his side of the story was therapeutic. Nonetheless, the officials said one purpose of the Adjustment Committee hearing was to determine the truth of the allegations. If the charges were found to be false, no disciplinary action, of course, would be taken.
 
 
 39
 The officials further stated that the reason witnesses, other than the accused, were not called before the hearing was that the previously prepared staff reports were normally sufficient to lay out the facts. They indicated further investigation would be ordered when the accused's testimony cast serious doubt on the reports.
 
 
 40
 The Adjustment Committee proceeding, highly informal, is thus perceived as and used as an administrative rehabilitation mechanism at Lewisburg, although its deliberations have an overtone of judicial fact-finding. Although reliance on staff written reports as a fact-finding mechanism obviously does not measure up to judicial standards which in this country traditionally rely on the crucible of cross-examination, we do not find the practical procedures for what is essentially a rehabilitation and correctional process so devoid of fairness as to constitute a denial of due process. Due process in a correctional institution setting should not be "so rigid as to require that the significant interests in informality, flexibility, and economy must always be sacrificed." See Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).
 
 
 41
 In light of the combined goals of fact determination and correctional treatment and rehabilitation intrinsic in the Adjustment Committee's tasks, we agree with the Second Circuit that due process is present when facts are rationally determined in a proceeding where the prisoner (1) is notified of the accusation and informed of the evidence against him, and (2) is afforded a reasonable opportunity to explain his actions. Sostre v. McGinnis, 442 F.2d 178, 198-199 (2d Cir. 1971), cert. denied sub nom. Oswald v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). Under these standards, the hearings granted appellants in this case comported with due process. As the district court found:
 
 Before the disciplinary committee acted
 
 42
 (1) Plaintiffs received adequate notice of the charges,
 
 
 43
 (2) Plaintiffs were informed of the substance of the evidence against them,
 
 
 44
 (3) Plaintiffs were given an opportunity to repond, and(4) The Committee made a reasonable investigation into the facts.
 
 
 45
 340 F.Supp. at 1002.
 
 
 46
 Appellants attack these findings in their assertion that the Adjustment Committee was partial because among its four members was Lewisburg Associate Warden Rauch. We do not find that the initiation of measures by such a high level administrative official to bring the near-mutiny at Allenwood under control disqualified him from serving as an impartial committee member. He had no personal involvement with any of the appellants because of their alleged infractions. He was neither a witness nor an investigator. Allenwood Superintendent Engle, who had prepared the written charges against the prisoners and given them to another prison official to investigate, was present at the committee hearings, not as a committee member, but as a resource person.
 
 
 47
 We also find no error with the district court determination that the Committee considered only relevant evidence. Although past misconduct reports and general comments on prison behavior were considered in determining the penalties to be assessed, such consideration was quite relevant and permissible for achievement of rehabilitation goals. We do not find clearly erroneous the explicit district court finding that plaintiffs "failed to prove that the Committee's determination was based on irrelevant evidence, and in particular failed to prove their contention that prison officials in the course of the disciplinary hearings considered letters written by the Plaintiffs to Congressmen and other governmental officials." 340 F.Supp. at 1002-1003.
 
 
 48
 The balance of appellants' contentions involve claims that further due process procedures should be required in Adjustment Committee hearings, i. e., written notice of the charges, representation by counsel or a lay substitute, confrontation and cross-examination of adverse witnesses, presentation of favorable witnesses, and a written report of the Committee's conclusions. We agree with appellants that the thrust of each of these procedural devices might improve the fact-finding function of the Adjustment Committee, but, in light of the sensitive needs of prison discipline, limited resources, and the proceeding's related goal of rehabilitation, we do not find that due process mandates their use.
 
 As the Second Circuit noted in Sostre:
 
 49
 [W]e think it inadvisable for a federal court to pass judgment one way or another as to the truly decisive consideration, whether formal due process requirements would be likely to help or to hinder in the state's endeavor to preserve order and discipline in its prisons and to return a rehabilitated individual to society.
 
 
 50
 442 F.2d at 197. As we have noted, the focus of the Adjustment Committee function is rehabilitative rather than punitive. We believe, therefore, that the transformation of this informal hearing into a formal adversary proceeding with the full panoply of counsel, cross-examination, witnesses, and written record could be self-defeating. We are apprehensive of the volatile effect such adversarial proceedings could have on internal prison control and stability. We fear that prisons, by their very nature packed with intensive emotional problems, would be kept at a perpetual boiling point by formal adversarial proceedings often involving varying shades of minor infractions. The procedures we approve of in this case, although perhaps not optimal in establishing the facts, are, we believe, adequate in view "of the precise nature of the governmental function involved as well as of the private interest" affected by it. See Morrissey v. Brewer, 408 U.S. at 481, 92 S.Ct. at 2600.
 
 
 51
 Two of the requested procedures of appellants are not so clearly oriented toward making adjustment committee hearings more adversarial. Neither written notice of the charges nor a written report of the committee's findings and conclusions would necessarily alter the nature of the proceedings in such a manner. We do not, however, believe either procedure is constitutionally required. Adequate notice of the charges was provided all appellants here verbally; written notification would add little to their ability to present their case to the Committee. Nor would a written report be necessary to insure a rational determination of the facts by the Committee, although it is undeniable that requiring such reports tends to force closer examination of the evidence. Written notice and a written report are desirable, however, and we recommend their future usage in such proceedings. We also note that since the prison proceedings in this case, the Bureau of Prisons has required both procedures of subsequent Adjustment Committee hearings. Bureau of Prisons Policy Statement 7400.5B, "Inmate Discipline."[9] We can also visualize situations where a prisoner may be completely inarticulate or have minimal ability to present his version of the facts. In such cases, the Adjustment Committee may find it desirable to appoint a staff person to assist him.
 
 
 52
 Courts for years had declined to interfere with prison procedures. Recognition of the important rights at stake in the prison environment has led recently to a much more activist judicial tone.[10] Prevention of arbitrary prison procedures which unduly deprive inmates of important rights is now recognized; the hands-off policy has been abandoned. When important rights are at stake, courts should not be reluctant to protect them. Nonetheless, we believe the judiciary must move with measured caution when it lays down requirements for affirmative action by prison administrators. "We do not doubt the magnitude of the task ahead before our correctional systems become acceptable and effective from a correctional, social and human viewpoint, but the proper tools for the job do not lie with a remote federal court." Sostre v. McGinnis, 442 F.2d at 205. Our expertise is limited; our knowledge of the extensive day to day prison problems is minimal; our ability to foresee the effect of procedural changes on treatment, rehabilitation and programmatic process is imperfect.
 
 
 53
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197 (3d Cir. 1973); Gray v. Creamer, 465 F.2d 179 (3d Cir. 1972); Biagiarelli v. Sielaff, 483 F.2d 508 (3d Cir., filed July 7, 1973)
 
 
 [2]
 Nine prisoners were plaintiffs in the district court; three of them, George Mische, Robert Eaton, and Michael Simons, have not appealed
 
 
 [3]
 Basic authority for the administration of inmate discipline in federal prisons is delegated by the head of each institution to an Adjustment Committee and/or Treatment Team. Regulations provide that the Committee shall consist of at least three members appointed by the head of the institution, one of whom shall be selected from the Correctional Service. Federal Bureau of Prisons Policy Statement 7400.5B, "Inmate Discipline," June 6, 1972
 
 
 [4]
 A more complete recitation of the facts can be found in the district court opinion. 340 F.Supp. 999 (M.D.Pa.1972)
 4A Although the district court found that the prisoners were aware of their right to appeal to the warden and the prisoners did not do so, we do not find this an appropriate case in which to deny review until exhaustion of all administrative remedies has been completed. Cf. Soyka v. Alldredge, 481 F.2d 303 (3d Cir., filed July 10, 1973), a habeas corpus proceeding, and Waddell v. Alldredge, 480 F.2d 1078 (3d Cir. filed June 29, 1973), a mandamus proceeding. We do not denigrate the doctrine that available administrative remedies must be exhausted first before judicial review is available; but in this civil rights action the primary thrust of appellants' arguments is that the standard procedures used in Lewisburg Adjustment Committee hearings are insufficient under the due process clause. Appeal to the warden on the grounds alleged would therefore have been futile.
 
 
 [5]
 A district court in this circuit has just recently held Gray retroactive for purposes of equitable relief, but not with regard to money damages. Jones v. Rundle, 358 F.Supp. 939 (E.D.Pa.1973)
 
 
 [6]
 Our interpretation of "unusual circumstances" should cause no disruption of present federal prison disciplinary procedures. Since the hearings in issue in this case, Federal Bureau of Prisons Policy Statement 7400.5B, "Inmate Discipline," June 6, 1972, has announced that investigation of prison misconduct charges and written notification of the charges to the accused prisoner must be made within 24 hours after he is placed in segregation
 
 
 [7]
 We note, however, that due process hearings have been required before such transfers in Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y.1970), reversed in part, Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971); Meola v. Fitzpatrick, 322 F.Supp. 878 (D.Mass.1971). Compare Hanvey v. Pinto, 441 F.2d 1154 (3d Cir. 1971), where we held no due process hearing was required before a state prisoner was transferred from one prison to another, resulting in a loss of the ability to earn good time days, in a non-disciplinary context
 
 
 [8]
 The preceding section canvasses appellant claims that due process hearings are required before the following types of disciplinary punishment are inflicted: (a) solitary confinement, (b) transfer to a different prison environment where bonus good time days cannot be earned, and (c) filing of bad conduct reports. The present case does not involve a question of whether due process hearings are required before prisoners are deprived of already accrued good time credits. That question is not raised because federal prison Adjustment Committees, as are involved here, cannot withdraw already earned good time credits
 Penalties in deprivation of accrued good time credits may only be assessed by a Good Time Forfeiture Board. That Board's procedures involve some of the safeguards sought by appellants here for Adjustment Committee proceedings: written notice of the charges, availability of a staff person as counsel substitute, the opportunity to present favorable witnesses and notice of the right to appeal to the Bureau of Prisons Office of General Counsel. See Bureau of Prisons Policy Statement 7400.6A "With-holding, Forfeiture, and Restoration of Good Time," August 13, 1971.
 Due process hearings were required before good time credits already accrued could be revoked in Carothers v. Follette, 314 F. Supp. 1014, 1026-1027 (S.D.N.Y.1970).
 
 
 [9]
 Two other contentions of appellants deserve little comment. Their claim that they had a right to be informed of the availability of appeal of the adjustment committee disposition to the prison warden lacks substance since they failed to demonstrate any ignorance of that right of appeal. Their claim that prisoners are entitled to use immunity for their testimony before the Adjustment Committee in order to allow them to speak freely without fear of future criminal prosecution is frivolous in light of the absence of any showing that these appellants felt precluded from making such a defense because of such fears. Moreover, it is the standard practice at Lewisburg not to hold adjustment hearings when a case is serious enough to warrant consideration of criminal charges
 
 
 [10]
 See, e. g., Collins v. Hancock, 354 F. Supp. 1253 (D.N.H.1973); Lathrop v. Brewer, 340 F.Supp. 873 (S.D.Iowa 1972); Urbano v. McCorkle, 334 F.Supp. 161 (D. N.J.1971); Landman v. Royster, 333 F. Supp. 621 (E.D.Va.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971); Bundy v. Cannon, 328 F.Supp. 165 (D.Md. 1971); Kritsky v. McGinnis, 313 F.Supp. 1247 (N.D.N.Y.1970); Morris v. Travisono, 310 F.Supp. 857 (D.R.I.1970); Nolan v. Scafati, 306 F.Supp. 1 (D.Mass.1969), rev'd, 430 F.2d 548 (1st Cir. 1970)