Randolph WALKER, Plaintiff,

v.

Charles HUGHES, former Warden, and Herb Beall, Individually and in his capacity as Warden of the Federal Correctional Institution at Milan, Michigan, Defendant.

Daniel S. BRIDGE, on behalf of himself and all others similarly situated, Plaintiffs,

v.

Charles HUGHES, former Warden, and Herb Beall, Individually and in his capacity as Warden of the Federal Correctional Institution at Milan, Michigan, Defendant.

Melvin DRAIN, Plaintiff,

v.

Charles HUGHES, former Warden, and Herb Beall, Individually and in his capacity as Warden of the Federal Correctional Institution at Milan, Michigan, Defendant.

Nos. 39765, 39834 and 40066.

United States District Court,
E. D. Michigan, S. D.

Jan. 24, 1974.

Martin I. Reisig, Detroit, Mich., for plaintiffs.

Ms. Gwenn Carr, Asst. U. S. Atty., Detroit, Mich., for defendants.

## MEMORANDUM OPINION

FEIKENS, District Judge.

In this class action plaintiffs allege that the procedures of the adjustment committee at the Federal Correctional Institution at Milan, Michigan (Milan) deprive the plaintiffs of liberty and property without due process of law in violation of the fifth amendment of the Constitution.[1] Plaintiffs contend that three distinct deprivations occur: (1) Inmates' liberty is further restricted by placement into segregation. (2) Inmates are transferred from Milan to maximum security penitentiaries for long term adults. (3) Inmates' parole dates are adversely affected.

Milan is a medium security institution for young offenders. It has a wide range of rehabilitative programs for its inmates, including vocational training, education, psychiatric and psychological therapy, and recreation. Defendant Herbert Beall is the warden at Milan, and is responsible for the administration of the institution.[2]

The parties have stipulated that plaintiffs Randolph Walker and David Bridge are representatives of the class of plaintiffs consisting of all inmates at Milan who are subject to the adjustment committee. Plaintiff Melvin Drain brought suit in this court on the same or similar issues, and these cases were consolidated for trial and decision.

### I. *Findings of Fact*

*Plaintiff Walker*

1. Prior to February 7, 1973, plaintiff Walker was housed in the therapeutic community at Milan. Therein Walker enjoyed the benefits of freedom of movement within the unit, personal and group therapy, recreation, education and vocational training.

2. After an incident on February 7, 1973, Walker was placed in segregation and given a written incident report, written by guard Richard Cox, accusing him of assaulting another inmate during the incident.

3. Sometime on or before February 9, 1973, Walker's caseworker and counselor, Richard Rison, as well as Lt. Ashworth and Capt. Yinger, questioned Walker concerning the incident.

4. Thereafter, at least four adjustment committee hearings were held con-

---

1. This court was faced with a similar issue in Colligan v. United States, 349 F.Supp. 1233 (E.D.Mich.1972).

2. The suit was originally filed against Charles Hughes, the former warden at Milan. The parties stipulated to the substitution of party-defendant.

cerning the Walker incident.[3] At the first, on February 9, 1973, the committee consisted of Rison, Dr. Weaver (Chief Psychologist) and Mr. Edgington (Business Manager). Walker was instructed to tell his side of the story, which he did. No decision was reached at this hearing.

5. On February 12, 1973, a second hearing was held. The committee at this hearing consisted of Capt. Yinger, Officer Friedman and Associate Warden Guienze. Walker repeated his story and no decision was reached.

6. On February 14, 1973, the committee met for the third time. The members of the committee were the same as those at the second hearing. Again no decision was reached.

7. Another hearing was held on February 16, 1973. This time the committee consisted of Capt. Yinger, Warden Guienze and Caseworker Rison. At this hearing, Walker changed his story. At the fifth hearing he was informed of the committee's decision to recommend his transfer to the penitentiary at Terre Haute, Indiana. Later it was determined that Walker would be transferred to the federal penitentiary at Lewisberg, Pennsylvania, a maximum security institution.[4]

8. According to the committee's written finding of guilt in the Walker case, the finding was based on "information provided by investigation into the incident".

9. At some point the assault charge was referred to the Federal Bureau of Investigation for possible prosecution, but this was subsequently declined.

10. Walker was never told at any of the hearings: (a) that he could have counsel or counsel substitute; (b) that what he said might be used against him; (c) that he could confront his accuser; (d) that he could call witnesses in his defense; (e) that he could see the investigative reports.

### Plaintiff Bridge

11. The parties stipulated to the following findings of fact with respect to Bridge:

"On or about January 17, 1973, Petitioner, DANIEL S. BRIDGE, was charged by the respondent on his authorized representative with five acts: (a) engaging in, or encouraging, a group demonstration; (b) refusing to obey an order from any staff member; (c) conduct which disrupts or interferes with the security or orderly running of the institution; (d) participating in an unauthorized meeting or gathering; and (e) assaulting a staff member.

On the evening of January 18, 1973, Petitioner was informed of the charges against him.

On January 22, 1973, before the 'adjustment committee', petitioner made a request to have counsel appointed to represent him.

He (Petitioner) denied touching the officer in the above incident.

Petitioner was found guilty of all offenses charged on January 17, 1973.

Petitioner requested to confront the officer making the charges. The request was denied.

As a result of these charges, Petitioner was confined to Administrative Segregation.

He was not offered assistance of counsel or counsel substitute. He was not allowed the opportunity to call witnesses on his own behalf. Nor was he allowed to confront and cross-examine adverse witnesses.

A member of the adjustment committee was Captain Yinger. Mr. Bridge's complaining officer on January 17,

---

3. Findings of fact numbers 4, 5, 6, 7 and 9 are based on a stipulation of the parties. Walker testified to somewhat different facts as to the committee membership at each of his hearings.

4. The court entered a preliminary injunction prohibiting this transfer. Walker resided in a segregation unit at Milan from February, 1973 until December of 1973 when he was released to the general population.

1973, is Senior Correctional Officer, Bunkie Elliott.

Petitioner originally filed his Motion for Writ of Habeas Corpus on or about March 21, 1973. Subsequently he was transferred to the Federal Correctional Institution at Terre Haute, Indiana, on April 13, 1973. He was confined to administrative segregation at Terre Haute from his arrival through May 21, 1973."

*Plaintiff Drain*

12. Prior to April 10, 1973, Drain was placed in the honor block at the institution. The benefits of this placement included an unlocked room and unlimited visitation by his family which resides in Detroit.

13. On April 10, 1973, Drain was charged with possession or introduction of any narcotic paraphernalia, and given written notice of the charge in an incident report.

14. The adjustment committee in Drain's case received the following report in an investigation into the incident:

"Drain has been named several times as the 'kingpin' in our drug activities in the Institution. He was suspected of pressuring inmates working in the business office to introduce contraband drugs. On one situation after receiving information that he had pressured an inmate for this purpose, a large amount of marijuana was found on a study release inmate that we suspect was intentionally dropped prior to search. Due to lack of conclusive evidence, we were unable to charge Drain with this incident. I might add that earlier this date there was a fight involving two unknown black inmates in F-1 Dormitory, the combatants ran from the dorm and could not be identified. Drain has a laceration on his leg and scratches on his hand that could have resulted from a fight."

Also, the investigator stated:

"It is the conclusion by this writer that DRAIN is the most active and powerful of the suspected drug dealers within the institution."

15. At the hearing Drain was asked to explain his side of the story and he denied any connection with the incident. Drain wanted to call a witness on his own behalf but was not allowed to do this.

16. The committee found Drain guilty. In its written findings, the committee stated that this was based on the "incident report" and on "your statement", referring to Drain's denial.

17. Finding number 10, *supra*, applies to Drain.

18. Pursuant to the recommendation of the adjustment committee, Drain was transferred to the Federal Penitentiary at Terre Haute, Indiana, a maximum security institution for long term adults, and was held in segregation for considerable time upon his arrival.

*Witness Saxner*

19. Prior to August 17, 1973, witness Saxner was incarcerated at Milan. On that date he asked a prison employee, Lopez, about improperly handling a fellow prisoner. A discussion ensued; other inmates gathered. Lt. Edwards of the staff arrived, and asked Saxner to tell him what happened.

20. That afternoon, Saxner was called to Capt. Yinger's office. Also in the office were Lt. Ashworth, Caseworker Rison and other officers. Saxner was given a written incident report charging him with threatening an officer, insolence toward a staff member and conduct which disrupts or interferes with the security or orderly running of the institution. Lopez was the accuser.

21. In Capt. Yinger's office, Saxner was asked if he had anything to say, and he denied the allegations. Lt. Ashworth told him he was unsuited for Milan and that he was being transferred to the Federal Penitentiary at Terre Haute, Indiana immediately. This transfer was termed an "administrative" transfer, rather than one resulting from an adjustment committee finding of guilt.

That day Saxner was transferred to Terre Haute.

22. Finding number 10, *supra*, applies to Saxner.

23. At Terre Haute, Saxner has been kept in segregation. Part of the basis for this has been the August 17, 1973 incident report at Milan.

24. Saxner was never found guilty and never appeared before an adjustment committee denominated as such.

*Witness Horton*

25. Prior to August 21, 1973, Dale Horton was an inmate at Milan. On that date he was given an incident report charging him with conduct disruptive to the institution and encouraging a group demonstration. This charge was based on the discovery of three posters in Horton's locker. Identical posters were found throughout the prison that day. The posters stated "Unite, Do It Now, Fast".

26. The next day Horton appeared at the adjustment committee and was asked to give his version of the facts. He admitted possession of the posters, but stated he had found them.

27. Finding number 10, *supra*, applies to Horton.

28. The committee found Horton guilty on August 22. Part of the basis on which that finding was made was a rumor that Horton was a "troublemaker". (This was testified to by Capt. Yinger.) Also cited in the incident report, as evidence of the incident, was the fact that a list of "addresses of several people and news medias from outside the institution" was found in the locker.

29. The committee decided that Horton should be transferred to the Federal Correctional Institution at Petersburg, Virginia.

30. The court finds that inmates at Milan are subject to three deprivations if found guilty by the adjustment committee: (a) Inmates may be placed in segregation where their rehabilitative programs are severely restricted. (b) Inmates may be transferred from Milan, a medium security, young adult facility, to a maximum security, long term adult facility. (c) Inmates' parole dates are adversely affected.

31. Further, the court finds that it is the practice of the administration at Milan in cases before the adjustment committee that a written incident report is given to the accused inmate, signed by the accusing staff member; that an investigation is undertaken and a statement is taken from the accused inmate; that the report of the investigation is given to the committee; that the committee asks the accused inmate his version of the facts; and that when a finding of guilty is made, it is based on the investigation report.[5]

32. Finally, the court finds that the administration at Milan in adjustment committee cases does not afford an accused inmate an opportunity to confront and cross-examine adverse witnesses, to call witnesses in his own defense, to remain silent, or to see investigation reports. Also, no attempt is made to provide a continuously identical panel of fact finders, or to exclude either staff who have investigated the incident, or the inmate's caseworker.

## II. *Discussion*

As noted, the prisoners contend that the extent of the deprivations visited upon an accused inmate who is found guilty by the adjustment committee requires the application of certain aspects of due process in an adjustment committee hearing. The government contends that the only due process procedures required are those already used by the adjustment committee.

In analyzing this issue, the court is guided by the analysis in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33

---

5. These procedures are in substantial compliance with the Milan Institution Policy Statement; Subject: Inmate Discipline, MM 7400.1, 7–20–72. *See also* Bureau of Prisons Policy Statement; subject: Inmate Discipline, No. 7400.5B, 6–6–72, which is quoted at length in *Colligan, supra* n.1, 349 F. Supp. at 1238–1239, n. 1.

L.Ed.2d 484 (1972). Therein, the Supreme Court held that the due process clause of the fourteenth amendment required that certain procedural rights be afforded a parolee before his parole can be revoked. In reaching this conclusion, the court first examined the nature of the parolee's interest in remaining on parole, in order to determine whether the interest was within the scope of the protection of the fourteenth amendment. Then the court, having determined that due process applied, balanced the interests of the government with those of the parolee, to determine what process was due.

### A. The Inmate's Interest in Remaining in the General Population

The evidence in the case is strong that an inmate has a substantial interest in remaining in the general population or in one of the honor units at Milan. Once put in segregation, an inmate loses benefits [6] that are important to him; they form the very core of his rehabilitative program. These include psychological therapy, recreation and exercise, and education and vocational training. Perhaps more important is the substantial loss of freedom of movement. An inmate in segregation is allowed out of his cell only for visiting, showers, medical treatment and one hour of exercise per day.

An inmate who is transferred to a maximum security institution for long term adults sustains losses in addition to those discussed above. See Capitan v. Cupp, 356 F.Supp. 302, 303 (D.Ore. 1972); Gomes v. Travisono, 353 F.Supp. 457 (D.R.I.1973); White v. Gillman, 360 F.Supp. 64 (S.D.Iowa 1973). A most significant disadvantage is the change from confinement with inmates of similar age to confinement with inmates of older age.[7] Further, it is the practice of the prison authority at Terre Haute, to which two witnesses were transferred from Milan, to place transferees into segregation for a considerable time.

Finally, there is no dispute that the parole date of an inmate found guilty of a disciplinary infraction is adversely affected.[8]

These deprivations to an inmate found guilty virtually end the inmate's rehabilitative program. The deprivations amount to a "grievous loss", within the meaning of Morrissey, supra.[9] The court concludes that the interests of an inmate in remaining in the general population, or in an honor unit, are substantial and that the due process clause of the fifth amendment is applicable and an inmate must be afforded a minimal due process hearing before he can be deprived of these benefits.[10]

---

6. It does not matter whether these benefits are labeled "rights" or "privileges". Morrissey v. Brewer, 408 U.S. at 482. See also Landman v. Royster, 333 F.Supp. 621, 651 (E.D.Va.1971).

7. In 1972 the average age of prisoners at Milan was 23.5 years, while at Lewisberg the average age was 31.8. Federal Bureau of Prisons Statistical Report, 1972, at p. 34.

8. Disciplinary infractions and placement in segregation deprive an inmate of "the opportunity to appear under more favorable circumstances before the parole board for consideration for release on parole". Carothers v. Follette, 314 F.Supp. 1014, 1027 (S.D.N.Y.1970). This also applies to youth offenders whose release dates are determined by the Youth Corrections Division of the Board of Parole under 18 U.S.C. § 5017(a). See also Clutchette v. Procunnier, 328 F.Supp. 767, 777 (N.D.Cal.1971).

9. "Whether any procedural protections are due depends on the extent to which an individual will be condemned to suffer a grievous loss." Morrissey v. Brewer, 408 U.S. at 481.

10. There was a time when courts would not entertain prisoners' challenges to prison procedure. See, e. g., Powell v. Hunter, 172 F.2d 330 (10th Cir. 1949). But the recent decisions are unanimous that while courts will not interfere with the broad discretion exercised by prison officials, courts will entertain prisoner petitions asserting violations of constitutional rights and will grant relief where appropriate. See, e. g., Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed. 2d 718 (1969); Matthews v. Hardy, 147 U.S.App.D.C. 39, 420 F.2d 607 (1969), cert. denied, 397 U.S. 1010, 90 S.Ct. 1231, 25 L. Ed.2d 423 (1970); Beard v. Alabama Bd. of Corrections, 413 F.2d 455 (5th Cir. 1969);

## B. Balancing the Interests

■ Chief Justice Burger stated in Morrissey v. Brewer, *supra*, at 481:

"It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands."

The determination of what process is due must be the result of a balancing of the governmental function served by the adjustment committee and the inmates' interests to be affected thereby.

### 1. The Function of the Adjustment Committee

The chief objectives of the processes of the adjustment committee are the security of the prison and the discipline (rehabilitation) of the inmates. The government argues, and the court agrees, that the prison administration needs a process for enforcing its rules, for the protection of the inmates, the administration and indeed society itself. Moreover, each inmate, as part of his rehabilitation program, needs to learn to live "by the rules" as a prerequisite to a successful life in society.

The prison administration is interested in a process that best advances the goals of internal security and inmate discipline. Such a process is one that operates swiftly and efficiently, for an inmate who knows that such a process will be visited upon him will be less likely to break the rules.

But the goals of internal security and inmate rehabilitation are also advanced by a process that provides optimum opportunity for an accurate determination of the truth of the accusation. An innocent inmate whose rehabilitation program is ended following an erroneous finding of guilt is an inmate quite likely to be beyond rehabilitation thereafter. The court emphasizes the rehabilitation objective of the Milan facility. *Cf.* 18 U.S.C. §§ 4081 and 5011.

Also, in light of the rehabilitation objective, the prison administration should be interested in a process that gives the inmate the sense that his case is fairly and justly decided. Such a process can assist in the inmate's rehabilitation by teaching respect for law.

### 2. The Interests of the Inmate

Turning now to the process in which the inmate is interested, it is apparent that he is likewise interested in accuracy, because of the nature and extent of the deprivations he may suffer.

He is also interested in efficiency. In addition to the concern caused by the pendency of the unresolved accusation, an inmate can reasonably be expected to suffer the anxiety of segregation that is commonly visited upon an inmate pending final determination of the charge. Also, as a result of segregation, an inmate's rehabilitation is interrupted and his release time may be affected.

## C. The Present Process

It is apparent to the court that the prison administration, in determining what procedures to incorporate into its adjustment committee process, places heavy emphasis on efficiency and ease of administration. The procedure now in use consists of little more than written notice to the inmate and an opportunity for the inmate to make a statement. The court cannot sanction such a process. The process puts too little emphasis on accuracy, a goal in which both the inmate and the administration have a strong interest. More important, the process is one that makes no effort to

---

Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968) ; Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970) ; Gray v. Creamer, 465 F.2d 179 (3d Cir. 1972) ; Breeden v. Jackson, 457 F. 2d 578 (4th Cir. 1972). Thus it is stated that prisoners do not lose all of their constitutional rights when they enter a prison. *See, e. g.,* Jones v. Wittenberg, 323 F.Supp.

93 (N.D.Ohio 1971), aff'd sub nom., Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972). "A prisoner retains all the rights of an ordinary citizen except those expressly or, by necessary implication, taken from him by law." Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944).

instill in the inmate a sense of fairness and justice. It does not aid in his reconciliation to society.

This does not mean that the full panoply of criminal due process rights must be accorded to an inmate. Such a process would give too little weight to efficiency and would unduly burden prison resources.

### D. *The Due Process Requirements*

■ In determining what process is constitutionally due in a prison setting the court is guided by the need for a compromise between efficiency and accuracy in the procedures of the adjustment committee. The issue has faced other courts with respect to other kinds of institutions.[11] The cases are unanimous that a prisoner is entitled to notice of the charges, to confront the evidence, and to make a statement. *See, e.g.,* Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971); Braxton v. Carlson, 483 F. 2d 933 (3d Cir. 1973); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal. 1971); Sands v. Wainwright, 357 F. Supp. 1062 (M.D.Fla.1973).

A neutral, detached and continuously identical panel of fact-finders is essential to an accurate determination of fact in each case. *See* Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Thus from the adjustment committee must be excluded any employee who investigated the incident, the accused inmate's caseworker (because of the confidentiality of the relationship), and anyone in a superior-subordinate relationship with the accuser (to eliminate the possibility of "command influence"). This principle was violated in several re-spects in this case. Walker's caseworker, Rison, served on Walker's adjustment committee. Moreover, both Rison and Capt. Yinger (who also sat on the committee) questioned Walker about the incident before the first hearing. The court notes that Walker's committee was not continuously identical at each of its several meetings. The requirement of continuity will not only aid in fact finding accuracy, but it will also make the process more efficient, and will help instill the sense of fairness that the inmate needs for his rehabilitation.

An inmate must be permitted to remain silent. Every inmate who testified stated that he was "instructed" or "requested" to tell his side of the story. Taking advantage of the right to remain silent must not constitute an automatic waiver of defense, however; an accused inmate must be afforded the opportunity to confront the evidence. Again, no inmate was given this opportunity. To give substance to both the right to remain silent, and the right to confront evidence, the inmate must be allowed, subject to reasonable regulation, to confront and cross-examine adverse witnesses, to see tangible evidence, and to present defense witnesses. History and tradition teaches that these procedures are essential to an accurate determination of the truth of an accusation.[12] *See* Morrissey v. Brewer, *supra;* Goldberg v. Kelly, *supra;* Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Clutchette v. Procunier, *supra;* Sands v. Wainwright, *supra.* At the same time, these procedures need not unduly burden prison resources, nor unduly lengthen the committee proc-

---

11. The defendant relies heavily on Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971). The petitioner therein, an inmate at Green Haven Correctional Facility in New York, challenged his placement into segregation. The court held that a procedure involving notice of the accusation, confrontation with the evidence and an opportunity to make a statement was sufficient to satisfy due process requirements.
*Sostre* is distinguishable on several grounds. That case dealt with a long term adult of-fender incarcerated in a maximum security institution, the primary objective of which is not rehabilitation. Also, *Sostre* was decided before Morrissey v. Brewer, *supra.*

12. "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross examine adverse witnesses." Goldberg v. Kelly, 397 U.S. at 269.

ess. The court will approve reasonable regulations allowing the adjustment committee wide discretion with respect to the scope and length of cross-examination and the number of defense witnesses. Even if there is a minimal loss in efficiency through the use of these procedures this is counterbalanced by an increase in the reliability of the fact finding process, and by an increase in the accused inmate's sense that he was fairly treated. Thus due process does not permit these procedures to be excluded arbitrarily from every adjustment committee case.

The court also holds that an accused inmate must be afforded, again subject to reasonable regulation, counsel or counsel substitute, such as another inmate, a prison employee, or a law student. Again this will aid in the fact finding process without burdening prison resources or lengthening the process.

Finally, the court holds that the decision of the adjustment committee must be based upon, and only upon, the evidence. Several violations of this principle occurred in the case. Several inmates were found guilty on the basis of the accusation itself. Also, part of the basis for the finding of guilt in Drain's case was rumor and opinion concerning Drain's drug activities.[13] A written decision summarizing the evidence and the reasons for the decision will force a close scrutiny of the evidence, without burdening the process.

■ These procedures must be employed in every case before the adjustment committee. In addition, the process must be applied every time that an inmate is subject to substantial deprivations for alleged violations of prison rules. The administration cannot avoid constitutional due process requirements by labeling a transfer "administrative" rather than "disciplinary", as happened in Horton's case.

Further, the court recognizes the need for segregation of an accused inmate, pending final determination. However, in such a situation the process must be commenced as soon as it is reasonably feasible.

Finally, each accused inmate must be informed either orally or in writing of his procedural rights when he appears before the committee.

### III. Conclusions of Law

■ 1. The nature and extent of the deprivations visited upon an inmate found guilty by the adjustment committee are such that the due process clause of the fifth amendment applies to adjustment committee processes.

■ 2. The process now employed by the prison administration at Milan does not comport with due process in that it gives too much weight to efficiency and ease of administration and insufficient weight to the accuracy of the process and the desirability of instilling a sense of fair play into the inmate, in light of the rehabilitation objective of Milan.

■ 3. Due process in the circumstances of this case requires that an accused inmate be afforded:[14] (a) a neutral, detached and continuously identical panel of fact finders, from which·must be excluded investigators, the accused inmate's caseworker, and any one in superior-subordinate relationship with the accuser; (b) the opportunity to remain silent; (c) the opportunity to confront his accuser; (d) the opportunity to cross-examine adverse witnesses; (e) the opportunity to present defense witnesses; (f) counsel or counsel substitute; (g) a written decision based upon and only upon the evidence; (h) oral or written notice of his procedural rights; (i) a hearing as soon as reasonably feasible after an inmate is placed in segregation following an alleged incident.

13. See also finding of fact number 28, supra.

14. As noted above, due process also requires written notice to the accused inmate. See Colligan, n.1, supra. However, the court will not incorporate such a requirement into an order, because the prison administration currently gives written notice as part of its procedure. See finding of fact number 31, and n.4, supra.

## IV.

The court has received letters and petitions from several inmates at Milan (plaintiffs in this class action), concerning the procedures of the adjustment committee. The court requests that counsel in the case meet with a prison official to discuss the proper disposition of these matters, in light of this opinion.

The court will order the return to Milan of the named plaintiffs who have been transferred to Terre Haute. Further, the court will order the reinstatement of each named plaintiff to the status and quarters he occupied prior to the alleged incident that resulted in his segregation or transfer, unless the prison administration affords the inmate a new hearing that fully complies with this opinion. Also, the court will order each named plaintiff's prison record expunged of any record of any hearing that does not comply with the mandates of this opinion.

An appropriate order, including within its terms a certification as to the class, may be submitted.