**David L. STONE and Emory Hyatt, Jr., et al., Plaintiffs,**

**v.**

**Charles EGELER et al., Defendants.**

**No. M–70–72 C.A.**

United States District Court,
W. D. Michigan, S. D.

Dec. 18, 1973.

William S. Easton, (court appointed), Marquette, Mich., for plaintiffs.

Frank J. Kelley, Atty. Gen., Lansing, Mich., for defendants.

## OPINION AND ORDER

FOX, Chief Judge.

This is a civil rights action brought by plaintiffs, David L. Stone and Emory Hyatt, Jr., against the Warden and Deputy Warden of the state prison at Jackson, Michigan, and the Deputy Director of Prisons in charge of correction facilities.

In their complaint, plaintiffs allege that while confined at the state prison at Jackson they were placed in administrative segregation pending investigation of their alleged involvement in the sale and possession of narcotics within the prison, that they were never prosecuted for the alleged offense, that they were thereafter transferred to the state prison at Marquette, and that such transfer was a punitive transfer imposed without the type of hearing demanded by due process requirements.

Plaintiff Stone claims that his administrative segregation for approximately two months, as well as his transfer from Jackson to Marquette, has resulted in the loss of approximately $1,000.00 in benefits under the G. I. Bill of Rights, increased travel costs for his wife's visits, inability to become involved in insti-

tutional programs, and a blemish on his record. Plaintiff Hyatt claims that the matter has adversely affected his release on parole. The relief sought is an order which would in effect prescribe the type of hearing which inmates must have and the rights which must be accorded to them when faced with charges of the type here involved. Plaintiff Stone claims actual damages of $1,600.00 and punitive damages of $3,000.00. Plaintiff Hyatt also seeks an order directing the Parole Board to release him on parole unless it determines that he is guilty of the charge of dealing in narcotics at Jackson. Plaintiffs also ask that they be returned to the prison at Jackson and that any loss of good time be restored to them.

Defendants filed a motion to dismiss the complaint for failure to state a cause of action, and on the ground that there are no genuine issues as to any material fact and defendants are entitled to a judgment as a matter of law. It is the defendants' position that the plaintiffs were administratively detained pending investigation of their involvement in bringing contraband narcotics into the prison at Jackson, that the police authorities ultimately determined there was insufficient evidence to prosecute in the state courts, and that thereafter plaintiffs were transferred from Jackson to Marquette not as a punitive matter, but for administrative reasons. All of this, it is claimed, is a reasonable course of conduct in the internal regulation and administration of the internal affairs of the Michigan penal institutions.

On November 5 and 9, 1973, the court held a full evidentiary hearing in this matter at which plaintiffs were represented by counsel. It appears from the evidence that in latter part of 1971, the prison officials suspected that the plaintiffs were involved in smuggling heroin into the prison at Jackson where plaintiffs were then confined. A state police investigation was conducted in December 1971. Upon completion of the investigation, the state police concluded that

there was insufficient evidence to warrant a prosecution in the Circuit Court. Approximately a month and a half later, plaintiffs were transferred from Jackson to the branch prison at Marquette, Michigan.

Gerald Hansen, Deputy Warden of the prison at Jackson, Michigan testified that the primary reason for the plaintiffs' transfer from Jackson was the security and good order of the institution and the well-being of the inmates. Assuming that is true, it is also true that the event which led to the transfer was the suspicion that the petitioners were involved in illicit drug traffic, and that after a thorough police investigation it was concluded there was insufficient evidence to prosecute the petitioners. The transfer to Marquette followed immediately thereafter. It is also undisputed that no hearing was held with respect to the proposed transfer from Jackson to Marquette at which petitioners could voice any objections.

At the hearing, defendants made an effort to equate the prisons at Jackson and Marquette. However, the regulations of the Michigan Department of Corrections belie this and indicate that the prison at Marquette is the ultimate maximum security institution in the Michigan penal system to which are sent the worst and most recalcitrant offenders. For example, BCF Regulation C–3, entitled "Inter-Institutional Transfer Policy" (defendants' Exhibit B) provides for the transfer of the following types of prisoners to the prison at Marquette:

"Long-term inmates who are believed to be escape risks; inmates who are dangerous or extremely assaultive; or those who have demonstrated that they are persistent management problems requiring maximum-security supervision; or appropriate cases requiring protection should be transferred to the Marquette Branch Prison. Offenders should be 20 years of age or older; however, exceptions will be made for the younger serious behavior problem."

Similarly, the regulation pertaining to the specific transfer of prisoners from the prison at Jackson (SPSM) to the prison at Marquette (defendants' Exhibit A) provides as follows:

"Inmates believed to be escape threats, either by circumstances of sentence or as indicated by their behavior, and men with poor institutional records necessitating maximum-security supervision over a protracted period, or those who require protection, should be transferred from SPSM to the appropriate facility, in most cases Marquette."

The court is aware that courts have in the past declared that a prisoner has no vested right to remain in any particular prison. See Gray v. Creamer, 465 F.2d 179, 187 (3rd Cir. 1972); Bundy v. Cannon, 328 F.Supp. 165, 173 (D.Md.1971). However, courts in recent years have also recognized that in certain circumstances a prisoner is entitled to some type of hearing before such a transfer is made.[1] In Gomes v. Travisono, 353 F. Supp. 457 (D.R.I.1973), the court held that the Fourteenth Amendment barred the transfer of prisoners from the Rhode Island prison system to prisons outside the state without prior due process hearings similar to those the court had previously decreed for punitive segregation. It is true that the transfers in *Gomes* involved transfer to another state, but a transfer from the prison at Jackson in the lower peninsula of Michigan to the prison at Marquette in a remote point in the upper peninsula of Michigan some 420 miles distant could well involve deprivations as serious as the deprivations which prompted the court to reach its decision in Gomes v. Travisono, supra. For example, in the case of petitioner Stone, the very distance involved made visitations from his family in the Jackson area impractical and

---

1. For example, even Bundy v. Cannon, supra, recognized that a transfer from the general population of one prison to segregated confinement in another prison may require the same type of minimal due process hearing used in prison disciplinary cases.

prohibitively expensive and interfered with the college program upon which he had embarked at Jackson.

The court also notes that in the report of the National Advisory Commission On Criminal Justice Standards and Goals, Standard 2.13 deals with "Procedures for Nondisciplinary Changes of Status". The Standard, which is quoted in toto in the appendix to this opinion, requires something less than the due process elements proposed for imposition of major disciplinary sanctions. Nevertheless it recommends some semblance of a hearing procedure where a change in a prisoner's status is contemplated, involving substantially adverse changes in such things as the degree, type, or location of custody. The recommendation of the Commission is that in such situations an administrative hearing be held, with notice to the prisoner, an opportunity to be heard, and a written report by the prison authority communicating its final decision. This standard provides in pertinent part as follows:

> "3. Where reviews involving substantially adverse changes in degree, type, location, or level of custody are conducted, an administrative hearing should be held, involving notice to the offender, an opportunity to be heard, and a written report by the correctional authority communicating the final outcome of the review. Where such actions, particularly transfers, must be made on an emergency basis, this procedure should be followed subsequent to the action. In the case of transfers between correctional and mental institutions, whether or not maintained by the correctional authority, such procedures should include specified procedural safeguards available for new or initial commitments to the general population of such institutions."

The court finds from the evidence presented at the hearing that the transfer of petitioners from the prison at Jackson to the prison at Marquette was triggered because of a suspicion that they were involved in illicit drug traffic; that a police investigation concluded there was insufficient evidence for a criminal prosecution; that the only evidence in the record to support the transfer is the unsupported conclusion of the prison officials that it was made for the security and good order of the institution and the well being of the petitioners; and that although this conclusion may be valid, it should, under the circumstances of this case, have been reached only after an administrative hearing which, at a minimum, provided prior notice to the petitioners of the proposed transfer, an opportunity for them to be heard, and a written report of the prison authorities stating their decision and their reasons therefor. The court further finds that the transfer of petitioners was a substantially adverse change in their status involving serious deprivations, and that the failure to afford them any type of hearing was a violation of their rights under the Fourteenth Amendment.[2]

As to plaintiffs' claim for damages, it is apparent that the defendants acted in good faith and in accordance with the existing prescribed procedures of the Michigan Department of Corrections. It would therefore be manifestly inappropriate to require them to answer in damages. See United States ex rel. Miller v. Twomey, 479 F.2d 701 (7th Cir. 1973), footnote 38.

For the reasons stated herein, defendants are directed to forthwith transfer the petitioners to the State Prison of Southern Michigan at Jackson, Michigan, and to place the petitioners in the same status and position occupied by

---

2. As to the claim of plaintiff Hyatt that the narcotic investigation incident adversely affected his parole, Gordon L. Fuller, Chairman of the Parole Board testified, and the court finds, that the denial of parole was not based on this isolated incident, but on Hyatt's total record, including the crime for which he was confined, his criminal history, his work history, his family ties, his behavior in prison, and his general attitude.

them prior to the narcotic investigation which led to their transfer to the prison at Marquette.

The fact that the court deems it inappropriate to award damages to the petitioners under the circumstances of this case does not detract from the fact that their transfer resulted in serious and substantial deprivations. The record before this court and the overall equities dictate that petitioners upon their arrival at the prison at Jackson be immediately released and discharged from further custody.

It is so ordered.

## APPENDIX

STANDARD 2.13

PROCEDURES FOR NONDISCIPLINARY CHANGES OF STATUS

Each correctional agency should immediately promulgate written rules and regulations to prescribe the procedures for determining and changing offender status, including classification, transfers, and major changes or decisions on participation in treatment, education, and work programs within the same facility.

1. The regulations should:

    a. Specify criteria for the several classifications to which offenders may be assigned and the privileges and duties of persons in each class.

    b. Specify frequency of status reviews or the nature of events that prompt such review.

    c. Be made available to offenders who may be affected by them.

    d. Provide for notice to the offender when his status is being reviewed.

    e. Provide for participation of the offender in decisions affecting his program.

2. The offender should be permitted to make his views known regarding the classification, transfer, or program decision under consideration. The offender should have an opportunity to oppose or support proposed changes in status or to initiate a review of his status.

3. Where reviews involving substantially adverse changes in degree, type, location, or level of custody are conducted, an administrative hearing should be held, involving notice to the offender, an opportunity to be heard, and a written report by the correctional authority communicating the final outcome of the review. Where such actions, particularly transfers, must be made on an emergency basis, this procedure should be followed subsequent to the action. In the case of transfers between correctional and mental institutions, whether or not maintained by the correctional authority, such procedures should include specified procedural safeguards available for new or initial commitments to the general population of such institutions.

4. Proceedings for nondisciplinary changes of status should not be used to impose disciplinary sanctions or otherwise punish offenders for violations of rules of conduct or other misbehavior.

*Commentary*

The area of nondisciplinary classification and status determinations long has been considered a proper subject for the diagnostic, evaluation, and decisional expertise of correctional administrators and specialists. Yet decisions of this kind can have a critical effect on the offender's degree of liberty, access to correctional services, basic conditions of existence within a correctional system, and eligibility for release. This is true especially in jurisdictions with indeterminate sentence structures and simple commitment of offenders to the correctional authority, without statutory or court specification of kinds of institutional or program treatment.

This standard seeks to strike an appropriate balance between the interests of the system and those of the offender, specifying some basic principles of offenders' rights in this area but with a specificity and degree of formality much less pervasive than the "due process" el-

120

ements proposed for imposition of major disciplinary sanctions.

First, the standard requires written rules and regulations, available to the offender, which clearly establish the basis for classification and other status determinations. This helps the individual understand the personal implications of each alternative choice so he can express an informed preference. In addition, specifying decision criteria communicates to the offender that decisions are not capricious or arbitrary.

The effectiveness of rehabilitation is related directly to the offender's understanding and acceptance of program objectives. An individual is more likely to accept and understand the reasons for a decision in which he participates. Therefore, the standard calls for notice to the offender when his status is under review and a maximum attempt to solicit his views in all of the wide range of decision-making that may be applied while he is under correctional control.

A formal hearing right is specified for reviews involving potential changes of a substantially adverse character in the offender's degree, type, or level of custody. Courts already have shown concern for such procedural protections in the case of transfers from prisons to hospitals for the criminally insane and from juvenile institutions to adult facilities.

*References*

1. American Correctional Association. Manual of Correctional Standards. 3d ed. Washington: ACA, 1966. Chas. 7, 26.

2. Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966) (Administrative commitment of prisoner to hospital for criminally insane at end of prison term without new judicial determination available to others so committed denies equal protection of laws.)

3. Cohen, Fred. The Legal Challenge to Corrections. Washington: Joint Commission on Correctional Manpower and Training, 1969.

4. Goldfarb, Ronald, and Singer, Linda. "Redressing Prisoners' Grievances," George Washington Law Review, 39 (1970), 298–301.

5. Morris v. Travisono, 310 F.Supp. 857 (D.R.I.1970) (Responding to change of discriminatory classification procedures in State prison, court order required (i) regular periodic review of classifications, (ii) enumeration of privileges and restrictions of each classification, (iii) written record of classification proceedings and notification to inmate of contemplated changes with reasons.)

6. People ex rel. Goldfinger v. Johnston, 53 Misc.2d 949, 280 N.Y.S.2d 304 (Sup.Ct.1967) (Court requires hearing before transferring juvenile from correctional school to institution for "defective delinquents.")

7. Shone v. Maine, 406 F.2d 844 (1st Cir. 1969) (Juvenile entitled to hearing and assistance of attorney in procedure to transfer from a juvenile institution to a men's prison as an "incorrigible.")

8. South Carolina Department of Corrections. The Emerging Rights of the Confined. Columbia: 1972.

9. U. S. ex rel. Schuster v. Herold, 410 F.2d 1071 (2d Cir. 1969). (Prisoner under life sentence could not be transferred to hospital for criminally insane without procedures, periodic review, and jury determination available for involuntary civil commitments.)

*Related Standards*

The following standards may be applicable in implementing Standard 2.13.

6.2 Classification for Inmate Management.

16.2 Administrative Justice.

16.4 Unifying Correctional Programs.