Edward H. ROBBINS et al., Plaintiffs,

v.

Richard G. KLEINDIENST et al., Defendants.

Civ. A. No. 2237–72.

United States District Court, District of Columbia.

Oct. 16, 1974.

**240**

Michael Ryan, Asst. U. S. Atty., Civ. Div., Washington, D. C., for defendants.

Ralph J. Temple, ACLU, Washington, D. C., Barbara Milstein, Alvin J. Bronstein, Michael Millemann, The Nat. Prison Project of American Civ. Liberties Union, Washington, D. C., Stanley Bass, NAACP, Legal Def. & Education Fund, New York City, David Allen, Lar Halpern, Legal Services Center, Seattle, Wash., for plaintiffs.

## ORDER

FLANNERY, District Judge.

This matter is before the court on plaintiffs' motion for certification as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and District Court Rule 1–13(b). Defendants oppose the motion, alleging that the requirements of Rule 23(a) and (b) have not been satisfied.

The complaint is filed on behalf of all federal prisoners "who have been or are subject to arbitrary and punitive transfers from one federal penal institution to another." Complaint at 2. "Plaintiffs also sue to require defendant policy-makers to promulgate specific rules and policies that will adequately protect plaintiffs' rights and to require them to supervise and control the implementation of these policies by their agents in the Federal prison system." Motion for Certification as a Class Action Pursuant to Rule 23(c)(1) Federal Rules of Civil Procedures and Local Rule 1–13, at 1. The Complaint sets forth four claims for injunctive and declaratory relief. The first claim alleges, in summary, that any transfer, for whatever reason, violates due process of law under the fifth and sixth amendments when accomplished without adequate written standards to control such transfers and when accomplished without notice, hearing, and other procedural safeguards. Complaint at 14. The second claim asserts that defendants violate plaintiffs' constitutional rights by transferring plaintiffs for engaging in constitutionally protected activities, including pursuing litigation, voicing criticism of prison conditions, and expressing political beliefs. Id. The third claim asserts that under present procedures the transfers and denial of rights flowing therefrom constitute cruel and unusual punishment in violation of the eighth amendment. Id. at 15. The fourth claim alleges that the Bureau of Prisons violates the equal protection guarantee of the fifth amendment in providing a hearing to prisoners for internal disciplinary proceedings but not providing a hearing to those prisoners who are transferred for disciplinary reasons. Id. at 15–16.

The court concludes for reasons stated hereafter that the first claim may be maintained as a class action pursuant to rule 23(b)(2). The court postpones consideration of class certification on the second, third and fourth claims until after consideration of plaintiffs' motion for partial summary judgment. See Fed.R.Civ.P. 23(c)(4)(A); Dist.Ct.R. 1–13(b).

For a case to proceed as a class action all the requirements of Rule 23(a) must be met as well as one of the subsections of Rule 23(b). All parties agree that the proposed class of 23,000 federal prisoners is sufficiently numerous that join-

der is impracticable. *See* Fed.R.Civ.P. 23(a)(1). The parties disagree, however on the remaining requirements of Rule 23.

As to the first claim, the court feels that there are questions of law or fact common to the class. Here the claim is almost completely a question of law— what minimal due process requirements, if any, are required before a prisoner is transferred for reasons of alleged misconduct from one federal penal institution to a more secure one. In certifying the class of federal prisoners in Abbott v. Richardson, Civil Action No. 1047–73, a case involving mail censorship by prison officials, Judge Bryant of this court stated that "the extent of constitutional protection afforded by the first amendment to prisoners' communications form the heart of this suit." Memorandum and Order, filed June 24, 1974. Similarly, in the instant case the extent of protection offered prisoners under the due process clause of the fifth amendment forms the heart of the present claim. Further, it appears from the record that the claims of the representative parties, all of whom were transferred without notice or hearing and all but one of whom were transferred to stricter confinement with consequent restriction of privileges, are representative of the claims of the rest of the class. Even though certain named representatives no longer are incarcerated, they still may represent the class. *See* Workman v. Mitchell, 502 F.2d 1201 at 1206–1207 (9th Cir. 1974). Finally, there is no showing that plaintiffs' claims might be in any way antagonistic to those of the members of the class on this first claim. *See* Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12, 24 (2d Cir. 1971); Phillips v. Klassen, 502 F.2d 362 at 366 (D.C.Cir. 1974). It seems clear that all inmates have an interest in being free from arbitrary, punitive and unjust transfers.

On the first claim the requirements of Rule 23(b)(2) also have been satisfied. That rule is applicable when the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Plaintiffs charge that defendants "have not promulgated specific policies and regulations which would adequately protect the rights of plaintiffs to freedom from arbitrary and punitive transfers. Moreover plaintiffs allege that defendants Carlson and Kleindienst have not adequately supervised their agents in the implementation of existing policies and regulations." Plaintiffs' Memorandum of Points and Authorities in Support of their Motion for Certification as a Class Action, at 4. This constitutes an allegation of a refusal to act and acting on grounds generally applicable to the entire class and hence Rule 23(b)(2) is satisfied. Finally, to the extent that certification of a class action under one of the provisions of Rule 23(b) is discretionary with the court, this court concludes that as regards this first claim, the class action procedure provides the most efficient and expeditious means of dealing with this threshold question of what, if any, due process is required as regards transfer of prisoners to more secure institutions.

Accordingly, it is this 16th day of October, 1974,

Ordered that as to plaintiffs' first claim, plaintiffs' motion for certification pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) be and the same hereby is granted; and it is further

Ordered that the class as to the first claim shall consist of all persons who as federal prisoners, have been, or in the future may be, subjected to transfers by defendants to more secure institutions because of alleged misconduct; and it is further

Ordered that as to plaintiffs' second, third and fourth claims, plaintiffs' motion for certification pursuant to Feder-

al Rules of Civil Procedure 23(a) and (b)(1), (2), and (3) be and the same hereby are denied without prejudice.

## ON MOTION FOR PARTIAL SUMMARY JUDGMENT

 The court has before it plaintiffs' motion for partial summary judgment and defendants' opposition thereto. Plaintiffs, a class of federal prisoners who have been, or in the future may be, transferred to more secure federal penal institutions because of alleged misconduct, complain that the Federal Bureau of Prisons' transfer policy violates their rights to due process of law. More specifically plaintiffs make the following allegations:

> The failure of defendants to promulgate written standards which adequately govern transfers between federal institutions and the failure of defendants to accord plaintiffs, and their class members, an opportunity, at a hearing before an impartial tribunal, to present reasons why a transfer is inappropriate including an opportunity to present evidence, present witnesses, cross-examine accusers, and

to be represented by counsel, or counsel substitute, deny plaintiffs life, liberty and property without due process of law in violation of the Fifth and Sixth Amendments to the United States Constitution. Complaint at 14.

This allegation, when considered in the factual context of this case, presents two basic issues for the court's consideration: whether the Federal Bureau of Prisons must promulgate new standards regarding prisoner transfers and whether a prisoner being transferred to a more secure institution because of alleged misconduct must be accorded procedural due process before the transfer.[1]

*Facts Not In Issue*

It is without dispute that the named plaintiffs in this class action have been transferred from prison to prison and that with one exception the transfer has been to a more secure facility. It appears further from defendants' answers to interrogatories that in each case the named plaintiffs were transferred for close custody or adjustment reasons. *See* Bureau of Prisons Policy Statement 7300.13C, at 8. For example, plaintiff

---

1. Defendants seek to raise a third issue—exhaustion of administrative remedies—which, if decided in favor of defendants, would bar judicial consideration of the substantive issues. On February 14, 1974, well after this suit was instituted, defendants issued Bureau of Prison Policy Statement 2001.6 entitled Administrative Remedy of Complaints Initiated by Offenders in Bureau of Prison Facilities. Citing Ross v. Henderson, 491 F.2d 116 (5th Cir. 1974), defendants assert that plaintiffs must seek administrative review before court review. The court does not need to address plaintiffs' argument that the exhaustion doctrine does not apply in this case. The law is clear, at any rate, that the exhaustion doctrine is inapplicable where such would be to demand a futile act. *See* Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968). The present case presents such a situation. Defendants steadfastly have asserted that plaintiffs have no right to any kind of notice or hearing prior to transfer and that no grievous loss possibly could be shown due to transfer to a more secure institution. Rather, defendants insist that the transfer policy is adequate and beyond attack.

Prior to the filing of the Complaint in November 1972, counsel for plaintiffs appealed to Mr. Carlson [employee of defendants] concerning a number of examples of transfer abuses such that he was well aware of plaintiffs' contentions that the Bureau's national policies were violating the rights of those entrusted to the Bureau's care. Complaint. ¶ 17. "In a case such as this, where the person with the power to act has already been informed of the facts, it would be 'to demand a futile act' to require an aggrieved person to first appeal to such person before resorting to federal court for relief." Plaintiffs' Response to Defendants' Memorandum in Opposition to Motion for Partial Summary Judgment, at 6–7, citing Sostre v. Rockefeller, 312 F.Supp. 863, 883 (S.D.N.Y.1971), modified on other grounds, 442 F.2d 178 (2d Cir. 1972).

The court agrees that to require exhaustion in the present case would be to require a futile act and accordingly the court will consider the merits of the plaintiffs' claims.

Robbins was transferred according to Bureau of Prison records because of active involvement with radical groups that were causing disruption in normal prison routine, emotional problems, a previous nearly successful escape, and four instances of violation of institutional conduct regulations from which the Warden concluded that Robbins was a security risk. Accordingly, prison authorities decided that Robbins needed "closer controls," and thus he was transferred to a more secure facility. *See* Defendants' Answers to Plaintiffs' First Interrogatories, filed December 10, 1973. Similarly, on one occasion plaintiff Johnson was transferred to a more secure facility because of attempted transfer of contraband, insolence toward a staff member, leaving his assigned work area without approval, and a disturbance in one of the cell houses. *Id.* Plaintiff Louie violated 12 institutional regulations and was transferred because his conduct showed that he needed "closer supervision and control." *Id.* Accordingly, the court agrees with the following part of plaintiffs' statement of material facts which are not in dispute:

> Defendants have transferred Plaintiffs several times from prison to prison. Each transfer, with the exception of Plaintiff Burke's transfer from a prison to a half-way house as part of Mr. Burke's release from custody, was to a more secure prison. In each case, Defendants believed that the transfer was an appropriate method for increasing the number and degree of controls on the transferee's life. Defendants believed that Plaintiffs required the additional controls because Plaintiffs were alleged to have engaged in misconduct within the institution. Statement Pursuant to Local Rule 1–9(g) of Material Facts Which Are Not In Dispute, filed Feb. 25, 1974 (citations to record omitted).

It appears further that in each case, in accord with Federal Bureau of Prison policy or practice, the prisoner was not given notice of the proposed transfer, an opportunity to contest it, or reasons for it.

*Federal Bureau of Prison Transfer Policy*

The Federal Bureau of Prisons' transfer policy is set forth in Bureau of Prison Policy Statement 7300.13C, issued October 15, 1973. Under this statement the Director has delegated transfer authority to the Chief Executive Officer of each federal facility. Although the Policy Statement emphasizes that most transfers should be made at the time of an inmate's initial classification, it also recognizes that subsequent transfers may be necessary "[w]hen it is apparent that the welfare of the offender will be best served, or the continuity of his training and treatment program maintained, or because the resources of the institution are not adequate to meet the problems presented by him. . . ." Bureau of Prisons Policy Statement 7300.13C, at 2. When a post-classification transfer is deemed necessary, "a special progress report bringing the entire case up to date . . . should be prepared." *Id.* at 7. When a transfer is finally decided upon, the reason for the transfer is appended to the transfer order. Those reasons are as follows:

*Institution Classification.* (This reason is most appropriate for transfers made at initial classification, and will usually involve transfer to an institution of a different type.)

*Nearer Release.* (This reason will be used when transfer is made to an institution nearer the offender's release destination, either at time of initial classification or at a later date.)

*Adjustment Purposes.* (This reason will ordinarily be used when the inmate is moved primarily for the purpose of providing closer supervision and controls, and is related to poor institutional adjustment.)

*Closer Custody.* (This reason will be used when custody, in terms of escape, is the primary concern.)

*Medical Attention.* (This includes persons moved for medical and psychiatric care, surgery, and narcotic addiction.)

*Medical Treatment Completed.*

*Training Purposes.* Transfer made for participation in a specific training program, as dental laboratory at Lewisburg, machine die and tool at El Reno, etc.)

*Work Study Release.* (When transfer is made specifically for participation in work-release program at receiving institution.)

*Community Centers.* (All transfers into guidance centers or other community residential centers shall be coded here.)

Temp. transfer to custody of U.S. Marshal or local authority.

*To Relieve Overcrowding.*

*To Build Up Population.*

*Voluntary Research project.* (Temporary transfer to participate in voluntary research project, *i. e.*, medical, behavioral, etc.)

*Drug Abuse Program.* (Non-NARA)
*Other.*

*Id.* at 8. There is no provision in this policy statement for any notification to or participation by the prisoner in the transfer proceeding.

The Bureau's transfer policy also is mentioned in Bureau of Prisons Policy Statement 7400.5B, issued June 6, 1972, regarding inmate discipline. That statement provides that "[t]ransfers for adjustment reasons may be considered, either as an aid to the adjustment of individual inmates or in the best interests of the institution community, in accordance with the guidelines expressed in Section 5, Adjustment Committee." Policy Statement 7400.5B, at 2. This policy statement sets forth in considerable detail the prisoner's rights and responsibilities and those acts which are prohibited. *See id.* at 3–6. Each inmate is apprised in writing of these regulations and it is apparent that for violation of these rules the Adjustment Committee

may recommend various disciplinary action, including transfer. *See id.* at 2. "The disciplinary action taken will be individualized in keeping with such factors as the offender's past history, institutional adjustment, motivation, and attitude." *Id.* at 6. In pertinent part, the Adjustment Committee procedures apparently include that the inmate charged with misconduct or violation of a rule or regulation "will be informed [in writing] of the specific charges and will be given an opportunity to answer. . . . The investigation shall be conducted by a member of the staff other than the reporting officer. Neither the reporting or the investigating officer shall be a member of the Adjustment Committee." *Id.* at 7.

> The disciplinary committee reports will clearly state what happened (the offense), where it occurred, time it occurred, and any witnesses (staff or inmates). A statement from the inmate about the offense will also be included. A clear statement of the conclusions of the committee, as to involvement in prohibited acts, the information upon which the conclusion is based, and its disposition will be included in the report. . . . The inmate will be advised in writing of the committee's decision. *Id.* at 8.

However, it appears that no plaintiff, even though apparently transferred for disciplinary reasons, was afforded any of the procedures outlined in Bureau of Prisons Policy Statement 7400.5B.

### Procedural Safeguards Before Transfer

The claims plaintiffs present must be analyzed in the manner set forth initially by the Supreme Court in its landmark decision in Morrissey v. Brewer, 408 U. S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Thus, it is first necessary to determine whether the due process clause applies to the activities in question and, second, if due process must be afforded, then what process is due under these particular circumstances.

*Morrissey,* of course, involved the revocation of parole for violations. The

Court considered whether the parolee was entitled to a hearing before revocation of parole and what procedures would be required if such a hearing were necessary. The Court recognized that the states have "an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole." 408 U.S. at 483, 92 S.Ct. at 2601. However, the Court also recognized that the parole revocation procedure involved two quite different aspects. First there was the purely factual aspect of determining whether, in fact, the parolee had violated the conditions of parole. The states have no interest in revoking parole if the proper factual pre-requisites are not determined. *Id.* at 479–480, 483, 92 S.Ct. 2593. The second aspect is the discretionary one—what factual circumstances, when reliably found, will justify revocation of parole. *See, id.* at 480, 92 S.Ct. 2593.

> The second question involves the application of expertise by the parole authority in making a prediction as to the ability of the individual to live in society without committing antisocial acts. This part of the decision, too, depends on facts, and therefore it is important for the board to know not only that some violation was committed but also to know accurately how many and how serious the violations were. Yet this second step, deciding what to do about the violation once it is identified, is not purely factual but also predictive and discretionary. *Id.*

The Court in *Morrissey* held that a parolee has a substantial interest, protected by the due process clause, in remaining on parole if he does not violate parole conditions. This "liberty" interest is not absolute "but only of the conditional liberty properly dependent on observance of special parole restrictions." *Id.* Yet, even this "conditional" liberty is protected by the due process clause. Thus, the Court concluded that the parolee has a right to notice and

hearing regarding the first aspect of the parole revocation procedure—the factual determination of whether a violation has occurred. The Court stated:

> We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a *"grievous loss"* on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a "right" or a "privilege." By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal. *Id.* at 482, 92 S.Ct. at 2601.

The Court added that such a procedure actually would promote the rehabilitation process by avoiding the resentment that might arise if arbitrary and summary processes were used. *See id.* at 484, 92 S.Ct. 2593. Thus, the Court ordered that the parolee be granted both a preliminary and final hearing, complete with notice, confrontation rights, and the right to present evidence and confront witnesses unless confrontation would require unwarranted disclosure of an informant.

The Court in *Morrissey* made clear, however, that what process is due will depend upon a careful balancing of the prisoner's interests and the state's interests under the particular circumstances of each case. Thus, a person free on parole might be entitled to considerably greater procedural safeguards than a person who is incarcerated since the latter person's "liberty" interests are more restricted and the state's interest in careful prison administration may be greater. *See id.* at 482, 92 S.Ct. 2593.

The Supreme Court in the recent case of Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), carefully has examined the due process considerations involved in internal prison administration. *Wolff* involved a Ne-

braska statute under which a prison disciplinary committee could deprive a prisoner of good-time credits on finding that the prisoner had violated important prison regulations. Under the Nebraska statute the committee orally would inform the prisoner of the misconduct charge and preliminarily discuss it with the prisoner. The committee then would hold a hearing where the charge was read to the inmate and the inmate was given an opportunity to ask questions. The Supreme Court held that in certain aspects this procedure violated the inmate's right to due process of law. Specifically, the Court held that the inmate was entitled to prior written notice of the charges (at least 24 hours) and that the committee prepare a written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.* at 2978. The Court also held that unless unduly hazardous or disruptive, the inmate should be able to present documentary evidence and to call witnesses. *Id.* at 2979–2980. However, keeping in mind the difficult position of prison officials, the Court did not give an unqualified right to call witnesses. The Court also greatly restricted the times when counsel or counsel substitute would be required and held that cross-examination and confrontation presented such threats to internal prison discipline that its grant rested in the discretion of prison authorities. *Id.* at 2980–2982.

The Court reached its decision in *Wolff* by determining that the prisoners had a liberty interest in good-time credits and that this interest was protected by the due process clause of the Fourteenth Amendment.

> Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." . . .
> But the State having created the right to good time and itself recognizing that its deprivation is a

sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated. *Id.* at 2975.

The Court continued, significantly, and indicated that where there is "*a major change in the conditions of confinement,*" then some minimum due process protections must be accorded. *Id.* at 2982 n. 19 (emphasis supplied).

The *Wolff* decision has been applied recently in a decision involving prisoner transfers. *See* Clonce v. Richardson, 379 F.Supp. 338 (W.D.Mo., 1974). In *Clonce* the Federal Bureau of Prisons had established a special program—S.T. A.R.T.—to which were transferred prisoners who had been particularly difficult to handle in their prior prisons. Indeed, most of those transferred had been in segregation status. Within the S.T.A.R.T. program they were kept under extremely stringent confinement. The court determined that S.T.A.R.T. was an involuntary program and that despite the prisoners' former segregated status, the S.T.A.R.T. program involved a major change in the conditions of confinement and thus that some minimal due process protections similar to those in *Wolff* were required. Accordingly, the court held that prior to selection and transfer to the S.T.A.R.T. program, the inmates had to be given notice and a hearing at which they could contest their selection and transfer. *Id.* at 348. Again, as in *Wolff* and *Morrissey*, there is implicit in *Clonce* the understanding that the notice and hearing is required to assure that the fact-finding process is fair and reliable and that the inmates that are chosen for S.T.A.R.T. do, in fact, meet the criteria set forth in the program's description. As to determination of those criteria, the court had nothing to say but it seems clear that those criteria, so long as they are articulated and are not

absurdly arbitrary or cruel, probably rest in the discretion of prison authorities. This is similar to *Morrissey* where the Court was careful that the courts not interfere with the decision as to what violations justify revocation of parole—that was a discretionary decision better left in most circumstances to prison authorities. The notice and hearing was required only to assure that the facts upon which such a discretionary decision was based were found fairly and reliably.

Many other federal courts have had occasion recently to consider the effect of a prisoner's transfer to tighter controls or closer supervision. The court in Walker v. Hughes, 375 F.Supp. 708 (E. D.Mich.1974) (appeal pending), considered the transfer of inmates from Milan, Michigan, a "medium security institution for young offenders" having a "wide range of rehabilitative programs" to the maximum security institution for long-term adults at Terre Haute, Indiana. *Id.* at 709–711. The court found that the prisoner often is forced to undergo a period of segregation,[2] a loss of freedom of movement, a change from confinement with prisoners of similar age to confinement with older prisoners, and an adverse effect on his parole opportunities. *Id.* at 713. Further, these deprivations also affect the inmate's rehabilitation program. *Id.* Numerous other federal courts have described the substantial effects that transfers have on the conditions of an inmate's confinement: period of segregation, Gomes v. Travisono, 353 F.Supp. 457, 462 (D.R.I.), aff'd in part, rev'd in part, 490 F.2d 1209 (1st Cir. 1973); Newkirk v. Butler, 464 F.Supp. 497 (S.D.N.Y.1973); Hoitt v. Vitek, 361 F.Supp. 1238, 1246 (D.N.H.1973); Croom v. Manson, 367 F.Supp. 586 (D.Conn.1973); Ault v. Holmes, 369 F.Supp. 288 (W.D.Ky. 1973); Stone v. Egeler, 377 F.Supp. 115

(W.D.Mich.1973); restriction of accessibility of family for visits, Captain v. Cupp, 356 F.Supp. 302 (D.Or.1972); Gomes v. Travisono, *supra* 353 F.Supp. at 462; Newkirk v. Butler, *supra* 464 F. Supp. at 500; Hoitt v. Vitek, *supra* 361 F.Supp. at 1248; Croom v. Manson, *supra* 367 F.Supp. 586; Stone v. Egeler, *supra* 377 F.Supp. 115; disruption of rehabilitation, Gomes v. Travisono, *supra* 353 F.Supp. at 462; White v. Gillman, 360 F.Supp. 64 (S.D.Iowa 1973); Hoitt v. Vitek, *supra* 361 F.Supp. at 1248–1249; Croom v. Manson, *supra* 367 F.Supp. 586; difficulty in access to counsel and to the courts, Gomes v. Travisono, supra 353 F.Supp. at 462; Hoitt v. Vitek, *supra* 361 F.Supp. at 1248–1249; Croom v. Manson, *supra* 367 F.Supp. 586; adverse effect on parole date and parole opportunities, Gomes v. Travisono, *supra* 353 F.Supp. at 463; Hoitt v. Vitek, *supra,* 361 F.Supp. at 1249; Croom v. Manson, *supra* 367 F.Supp. 586; Stone v. Egeler, *supra*; adjustment to different inmate population, White v. Gillman, *supra* 360 F.Supp. at 65; Hoitt v. Vitek, *supra* 361 F.Supp. at 1249; harsher discipline, White v. Gillman, *supra*; more limited library and recreational facilities, Newkirk v. Butler, *supra* 464 F. Supp. at 500; increased mail censorship and more limited access to literature, Hoitt v. Vitek, *supra* 361 F.Supp. at 1249; and less psychological and medical treatment facilities, Hoitt v. Vitek, *supra* at 1249. These courts, considering the substantial effect that these transfers have on a prisoner's confinement, have held that prior to transfer the inmaes must be afforded substantial procedural safeguards including notice and hearing. *See* Walker v. Huges, *supra* 375 F.Supp. at 715–717; Captain v. Cupp, *supra*; Gomes v. Travisono, *supra* at 353 F.Supp. at 466–468; White v. Gillman, *supra*; Newkirk v. Butler, *supra;* Hoitt v. Vitek, *supra* 361

---

**2.** The *Wolff* Court stated specifically that imposition of solitary confinement would constitute "a major change in the conditions of confinement" and accordingly "there should be minimum procedural safeguards as a hedge against arbitrary determination of the factual predicate for imposition of the sanction." Wolff v. McDonnell, *supra* 94 S. Ct. at 2982 n. 19.

F.Supp. at 1251–1253; Croom v. Manson, *supra* 367 F.Supp. 586; Kessler v. Cupp, 372 F.Supp. 76 (D.Or.1973); Stone v. Egeler, *supra.*

■■ In the instant case the facts not in dispute show that named plaintiffs were transferred to more secure custody, each time because defendants believed it was important to increase the number and degree of controls on the inmate's life. Such changes clearly may affect adversely, *inter alia,* an inmate's opportunity for parole, his access to particular rehabilitative facilities and his continuity in particular rehabilitative programs, restrict his freedom of movement, vary the inmate population with which he associates, and cause him to be placed in solitary confinement for a period of time. Under the reasoning set forth in Wolff v. McDonnell, Clonce v. Richardson and the cases cited earlier, the court holds that transfers such as these in question from a less secure to a more secure institution constitute a major change in the conditions of confinement and thus due process safeguards must be provided. The court agrees further with *Clonce* and holds that at a minimum, an inmate is entitled to the type of notice and hearing required by the Supreme Court in Wolff v. McDonnell.[3]

■ The court is not persuaded by defendants' claims that the requirements of notice and hearing will unduly burden internal prison administration. The Supreme Court carefully balanced the competing interests in Wolff v. McDonnell and held that some but not all due process safeguards are constitutionally required before the inmate is subjected to a major change in the conditions of confinement. The prison system has no interest in transferring a prisoner unless the factual reasons for such a transfer are reliably found. The notice and hearing requirements set forth in *Wolff* require little more than would be expected in order to reliably find those facts.[4] In the area of inmate discipline the Federal Bureau of Prisons grants procedural safeguards which approximate in many respects those required in *Wolff*. See Bureau of Prisons Policy Statement 7400.5B. If such safeguards can be granted in the area of inmate discipline, then certainly they also can be granted prior to transfer, especially where transfer is made for disciplinary reasons.[5]

---

3. In the instant case plaintiffs present only the question of whether transfers from less secure to more secure prisons constitute a major change in the conditions of confinement. The court has held that such transfers do constitute a major change and thus due process protections must be afforded. However, the court, in passing, recognizes that many of the effects felt by a prisoner, including segregation and disruption or curtailment of rehabilitation programs, might also occur when a prisoner is transferred between prisons of the same security status. If such major changes occur, then, of course, procedural protections must be afforded. The court in Clonce v. Richardson, *supra* 379 F.Supp. at 349 stated significantly:

The fact that the Bureau of Prisons may view or label a transfer . . . as a "treatment program" for the prisoner's benefit rather than as a sanction or as some form of punishment is not a relevant factor in the determination of the due process question involved. The relevant consideration under the Supreme Court's standards articulated in Wolff v. Mc-

Donnell is whether, on the facts, the transfer to a behavioral modification program involves a major change in the conditions of the prisoner's confinement.

*Accord,* Gomes v. Travisono, *supra* 353 F.Supp. at 467; Kessler v. Cupp, *supra* 372 F.Supp. 76.

4. Bureau of Prisons Policy Statement 7300.-13C already requires that a special progress report be prepared before a post-classification transfer is made. *See* Bureau of Prisons Policy Statement 7300.13C, at 7.

5. The court recognizes that there may be emergency situations as during riots where transfer might have to be effected prior to notice and hearing. The court in Kessler v. Cupp, 372 F.Supp. 76 (D.Or.1973), recognized such an exception but then stated:

[W]here such a transfer occurs as a result of the determination by the Warden of the existence of such an emergency, the transferred inmate must be returned to the institution for a hearing. . . . Ordinarily, the Warden would face an unusually heavy burden to justify any period of time greater than thirty days for such return

Plaintiffs, in their proposed Order which accompanies their motion for partial summary judgment, ask the court to order "[t]hat the records maintained by Defendants of each of the Plaintiffs be expunged of all alleged acts of misconduct by Plaintiffs which resulted in the transfers of Plaintiffs. . . . " The Court in *Wolff* dealt at length with the question of retroactivity:

> The question of retroactivity of new procedural rules affecting inquiries into infractions of prison discipline is effectively foreclosed by this Court's ruling in *Morrissey* that the due process requirements there announced were to be "applicable to *future* revocations of parole," . . . . Despite the fact that procedures are related to the integrity of the fact-finding process, in the context of disciplinary proceedings, where less is generally at stake for an individual than at a criminal trial, great weight should be given to the significant impact a retroactivity ruling would have on the administration of all prisons in the country, and the reliance prison officials placed, in good faith, on prior law not requiring such procedures. 94 S.Ct. at 2983.

Accordingly, the *Wolff* Court reversed that part of the Court of Appeals' ruling that had ordered expungement of prison records containing determinations of misconduct that had not been in accord with required procedures. Similarly in this case, while hereafter the Bureau of Prisons must afford procedural safeguards before certain prisoner transfers, this court declines to order past records expunged.

*Standards Governing Prisoner Transfers*

Plaintiffs also ask this court to order the Federal Bureau of Prisons to promulgate written standards to govern transfers of prisoners. Plaintiffs recognize that prison authorities need considerable flexibility in performing their duties but assert that such discretionary decisions must be within standards and principles articulated in as much detail as possible. *See* Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment at 23–25. Defendants reply that Bureau of Prisons Policy Statement 7300.13C provides adequate guidelines for prisoner transfers. Defendants also cite at length dictum from the Supreme Court's recent decision in Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974), to the effect that:

> Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. . . . Most [of these decisions] require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. . . . [C]ourts are ill-equipped to deal with the increasingly urgent problems of prison administration and reform.

The court agrees completely with this statement and has no desire to dictate what standards should be set governing prisoner transfers.

Bureau of Prisons Policy Statement 7300.13C in its "Reasons for Transfer," set forth verbatim earlier in this opinion, and Bureau of Prisons Policy Statement 7400.5B do enunciate some standards for prisoner transfer. The question now presented however, is whether, given the court's holding that procedural safeguards in the form of notice and hearing must be afforded prior to trans-

---

and hearing procedure. It should be crystal clear, however, that the determination of the institution-wide emergency situation is one which calls into play the informed expertise of the Superintendent or Warden. Courts cannot and should not "second guess" wardens on this score.

fer, an inmate also should know more specifically the reasons for which he may be transferred.

██ The named plaintiffs in this action apparently have been transferred for "Adjustment Purposes," meaning the inmate is moved "primarily for the purpose of providing closer supervision and controls and is related to poor institutional adjustment," or for "Closer Custody," meaning primarily because of the danger of escape. *See* Bureau of Prisons Policy Statement 7300.13C, at 8. While Bureau of Prisons Policy Statement 7300.13C does not explain further these categories, the court notes that Bureau of Prisons Policy Statement 7400.5B concerning inmate discipline offers relevant amplification. In that statement the Bureau at considerable length sets forth an inmate's rights and responsibilities, the acts prohibited by the institution, and the possible sanctions for violation. *See* Bureau of Prisons Policy Statement 7400.5B, at 3–6. One sanction is transfer. *Id.* at 2. The policy statement provides that all inmates be informed in writing of these rights and responsibilities, prohibited acts, and possible sanctions. *Id.* The policy statement does not state precisely when transfer will be the recommended sanction but states that the "disciplinary action taken [on recommendation of the Adjustment Committee] will be individualized in keeping with such factors as the offender's past history, institutional adjustment, motivation, and attitude." *Id.* at 6. The court in Newkirk v. Butler, *supra,* stated:

> Prisoners are entitled to know what the rules are, what actions will be met with sanctions. They are entitled to know the general range of sanctions that may be imposed for given offens-

es. 364 F.Supp. at 503 (footnote omitted).

The court believes that the guidelines and standards set forth in the two policy statements, when coupled with *Wolff*-type procedural safeguards which hereafter will apply, are sufficient to give notice of rules' and sanctions to the inmates and to assure that no arbitrary administrative action will occur. The Supreme Court often has recognized that the courts have a very restricted role in reviewing the standards and guidelines established by prison administrators. *See, e. g.,* Procunier v. Martinez, *supra* 94 S.Ct. at 1807; Morrissey v. Brewer, *supra,* 408 U.S. at 479–480, 92 S.Ct. 2593.

██ Accordingly, the court declines to order the Bureau to enunciate new standards governing prisoner transfer.[6]

*Conclusion*

The court concludes that plaintiffs are entitled to summary judgment on the issue of whether an inmate is entitled to procedural due process before being transferred to a more secure institution for alleged misconduct. The court concludes, however, that plaintiffs are not entitled to summary judgment on the issue of whether defendants must promulgate new standards regarding prisoner transfers. While defendants have not moved for summary judgment on this issue, there is no dispute as to any material fact. Had defendants made an appropriate motion they would be entitled to summary judgment. Under the circumstances, such a motion is not necessary. Local 453, International Union of Electrical, Radio & Machine Workers v. Otis Elevator Co., 314 F.2d 25 (2d Cir. 1963). *See* 6 J. Moore, Federal Practice ¶ 56.12, at 2241–43 (2d ed. 1974).

---

**6.** The court has considered only the question of whether the standards enunciated for adjustment and closer custody-type transfers are sufficient. The court has not considered standards for other types of transfers since the named plaintiffs have only suffered from the disciplinary types of transfers and the standards regarding other types of transfers have not been fully addressed by the parties.